**FORD MOTOR COMPANY/THOMAS AND VIRGIL CROSS,**
Appellants,

v.

**TEXAS DEPARTMENT OF TRANSPORTATION, MOTOR VEHICLE DIVISION; and Thomas and Virgil Cross/ Ford Motor Company, Appellees.**

No. 03–96–00129–CV.

Court of Appeals of Texas, Austin.

Dec. 12, 1996.

---

Mark Allen Land, Glenn Van Shellenbeck, O'Connell, Van Shellenbeck & Land, Austin, for Thomas and Virgil Cross.

Meloney J. Cargil, Bush Craddock & Reneker, L.L.P., Dallas, for Ford Motor Company.

Dan Morales, Attorney General, Austin, for Appellee.

Mary A. Keeney, Assistant Attorney General, Natural Resources Division, Austin, for TxDOT.

Before JONES, KIDD and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

Ford Motor Company appeals the district court's order affirming the decision of the Texas Department of Transportation, Motor Vehicle Division ("Department") ordering Ford to repurchase a vehicle from the owners, Virgil and Thomas Cross. Ford contends the trial court erred in upholding the decision because substantial evidence did not support the Department's findings of fact and conclusions of law that 1) the vehicle failed to comply with Ford's express warranty; 2) the manufacturer was permitted a reasonable number of attempts to repair the vehicle; 3) the vehicle had a continuing defect; and 4) the alleged defect substantially impaired the use of the vehicle. Ford also contends the Department's action was arbitrary and capricious in determining the allowance for use of the vehicle and in calculating the repurchase price. In a cross-point, the Crosses assert the district court erred in striking its counterclaims against Ford under the Deceptive Trade Practices Act (DTPA)

and for breach of contract and of warranty. We will affirm in part and reverse and remand in part.

## BACKGROUND

In October 1993 Thomas and Virgil Cross purchased a new Ford AeroMax semi-tractor vehicle for $83,190. The brothers planned to use the truck to haul loads cross-country, one driving while the other slept in the sleeper cab. Three days after they purchased the vehicle, the Crosses took it to a Ford dealership, complaining of excessive vibration. Ford took no action, however, and the Crosses eventually took the vehicle to Ford dealerships for servicing six more times, each time complaining of vibration. In April 1994 the Crosses filed a complaint before the Texas Department of Transportation, Motor Vehicle Division, seeking relief under the Texas Motor Vehicle Commission Code. *See* Tex. Rev.Civ.Stat.Ann. art. 4413(36), § 6.07 (West Supp.1997) (commonly called the "lemon law"). After a hearing, the hearing examiner found that the statutory prerequisites had been met and ordered Ford to repurchase the vehicle for $75,266.22.[1]

Ford brought an action for judicial review of the Department's decision, a temporary restraining order, and preliminary and permanent injunctions against the Crosses and the Department. *Id.* § 7.01. The Crosses filed a counterclaim asserting violations of the DTPA and breach of contract and of warranty. The district court affirmed the Department's decision and denied the temporary restraining order and injunctions. The trial court subsequently granted Ford's motion to strike the Crosses' counterclaim. Both parties appeal the trial court's judgment.

## GOVERNING LAW AND STANDARD OF REVIEW

If a new motor vehicle fails to conform to the manufacturer's express warranties, the Department may order the manufacturer to

---

1. The Crosses also joined as defendants Caterpillar, Incorporated; Rockwell, International; and Eaton Corporation in their complaint before the Division. Caterpillar and Rockwell were dismissed upon their unopposed motion at the hearing. The hearing examiner, finding that no evidence was presented against Eaton, dismissed Eaton as well. Those actions have not been appealed.

attempt to conform the vehicle to the warranty. *Id.* § 6.07(b). The statute also authorizes the Department to order replacement or repurchase if

> the manufacturer ... is unable to conform the vehicle to the express warranty by repairing or correcting any defect or condition which creates a serious safety hazard or substantially impairs the use or market value of the motor vehicle after a reasonable number of attempts....

*Id.* § 6.07(c). The statute delineates situations which create a rebuttable presumption that the manufacturer had a reasonable opportunity to repair the vehicle. *Id.* § 6.07(d). In the event of repurchase, the manufacturer must accept the vehicle's return in exchange for a refund of the purchase price less a reasonable allowance for the owner's use and any other allowances or refunds payable to the owner. *Id.* § 6.07(c).

We review the decision of the Department under the substantial evidence rule. *Id.* § 7.01(a).[2] In conducting a substantial evidence review, we must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989); *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 453 (Tex.1984). We may not substitute our judgment for that of the agency and may consider only the record on which the agency based its decision. *Sizemore,* 759 S.W.2d at 116. If substantial evidence would support either affirmative or negative findings, the reviewing court must uphold the order, resolving any conflicts in favor of the agency's decision. *Auto Convoy Co. v. Railroad Comm'n,* 507 S.W.2d 718, 722 (Tex.1974). The reviewing court should sustain the decision if it determines that reasonable minds could have reached the same conclusion the agency

reached. *Suburban Util. Corp. v. Public Util. Comm'n,* 652 S.W.2d 358, 364 (Tex. 1983).

## DISCUSSION

The hearing examiner heard the testimony of complainants and several witnesses called by both the Crosses and Ford. The examiner also participated in a test drive of the truck and watched a video taken by the Crosses illustrating the alleged defects.

*Breach of Express Warranty*

In point of error one Ford contends, first, that the existence of a defect was unsupported by substantial evidence, and second, that the Crosses failed to show the specific defect violated the warranty because there was no testimony and no finding on how the alleged vibration affected factory-supplied materials and workmanship.

In finding the truck suffered from "excessive vibration that is in all probability due to the misalignment of the driveline angles," the hearing examiner relied heavily on testimony given by John Goines, a service representative from Eaton Corporation, whom the Nichols Ford dealership consulted during one of the Crosses' repair visits.[3] Goines performed sensitive measurements using an electronic protractor to complete a drivetrain troubleshooting chart customarily used in the industry. The results showed two of the three driveline angles exceeded Ford's recommended specifications. Ed Bolcer, a Ford engineer, testified noncompliance with Ford's specifications could cause the vibration. In addition to the Crosses' testimony that the vibration made sleep impossible, several other witnesses testified that the truck vibrated excessively, particularly when it was fully loaded. Only the Ford specialists, Bolcer and Gerald Sheets, testified they noticed no abnormal vibration in the truck during a test drive in which the truck was not loaded. Although the hearing examiner did not notice excessive vibration during her test drive, she

---

**2.** Section 7.01(a) of the statute states that judicial review of the Department's decision shall be under the substantial evidence rule and, to the extent not inconsistent, pursuant to the Administrative Procedure Act (the "APA"), codified at Tex.Gov't Code § 2001.001 et seq. (West 1997).

**3.** Goines was called to inspect the transmission manufactured by Eaton to discover if it was the source of the vibration. He concluded the transmission was not the cause.

placed little weight on that observation because of the testimony indicating the vibration was more pronounced when the truck was loaded. In addition, the hearing examiner watched a video taken by Virgil Cross illustrating the driveline while the truck was in motion. She noted the "violent shaking" of the driveline and a prominent metal tab rubbing a shiny spot on the shaft.. At least two witnesses, including Wayne Swift, the Nichols shop foreman, characterized this contact between the shaft and the metal tab as abnormal.

█ Ford's basic warranty, which covered the truck for the first twelve months or 100,000 miles, fully warranted "all parts found to be defective. in factory-supplied materials and workmanship," save certain exceptions not applicable here. In addition, a powertrain warranty warranted against defects in the factory-supplied materials and workmanship of the engine and drivetrain, which included the transmission, axles, and drive shaft.[4] Sheets testified that Ford assembled the parts composing the drive shaft and established the driveline angles on this truck. Ford did not dispute warranty coverage at the hearing. Reasonable minds could have concluded, from the record as a whole, that the truck had a vibration defect caused by misaligned driveline angles which was covered by Ford's express warranty. *See Charter Medical*, 665 S.W.2d at 452. Accordingly, we overrule the first point of error.

*Existence of Continuing Defect/Substantial Impairment of Use of Vehicle*

█ In its third and fourth points of error Ford challenges the Department's findings of fact and conclusions of law that the truck had a defect at the time of the hearing and that the defect substantially impaired the use of the truck. Ford contends there was no continuing defect because Ford repaired any

defect subsequent to Goines' diagnosis, and Sheets and Bolcer detected no abnormal vibration during their test drive after this repair. As noted, the truck was not loaded during that test drive. Furthermore, Ford simply retimed the driveline, which by Swift's own testimony would not have corrected the discrepancy in the misaligned angles. Although Goines gave his diagnosis and recommendations to Nichols, Ford's own testimony indicated the driveline angles were never checked again. From the evidence supporting the existence of the defect along with the absence of evidence that Ford ever corrected the misaligned angles, reasonable minds could have concluded that the truck had a continuing defect. *See id.*

█ The Crosses testified they were unable to use the sleeper cab for its intended use due to the vibration. Patrick Psencik, a consumer advisor for the Department,[5] testified that the steering wheel and dashboard shook while the truck was in motion and characterized the ride in the sleeper as uncomfortable. Bryant Trenary, an engineer called by the Crosses, testified the excessive vibration could cause drive shaft failure, which would be disastrous if it occurred while the truck was on the highway. We thus conclude the evidence also supported the Department's finding that the defect substantially impaired the truck's use. We overrule points of error three and four.

*Reasonable Number of Repair Attempts*

In point of error two Ford contends it was not allowed a reasonable number of attempts to repair the truck before being ordered to repurchase it. *See* Tex.Rev.Civ.Stat.Ann. art. 4413(36), § 6.07(c) (West Supp.1997). The hearing examiner found the Crosses presented their truck to authorized Ford dealerships for repair of a vibration problem in October 1993 and in January, March, May, and June of 1994.[6] Ford argued at the hear-

---

4. Testimony at the hearing indicated the driveline is the shaft going from the transmission to the drive axle. Counsel and witnesses used the terms "driveline" and "shaft" interchangeably at the hearing.

5. Psencik's role was to review complaints and recommend repair, mediation, or a hearing.

6. The Crosses also presented the truck for repair a second time in May and in August 1994. On May 31 new tires were installed and the wheels realigned; Virgil Cross testified that the misalignment was caused by pins that had been loosened by the excessive vibration. These two visits were not included in determining whether Ford

ing and on appeal that two of these visits should not be considered attempted repairs because the repair orders did not indicate a vibration problem.[7] However, the hearing examiner stated in her decision that she "relie[d] upon the sworn statements of both Virgil and Thomas Cross in concluding that the truck was brought in for excessive vibration on both of those dates." The hearing examiner was entitled to rely on the complainants' testimony and we are not permitted to substitute our judgment as to the credibility of the evidence. *Sizemore*, 759 S.W.2d at 116.

■ Ford urges that, even assuming a vibration complaint was made at each repair visit, it was not given a reasonable number of repair attempts because the statutory presumptions were not met. Ford points out that at the first and second repair visits the Crosses complained merely that the vehicle suffered a vibration of one to two seconds while in seventh gear, which was different from their lemon law complaint. Thus Ford contends the first attempt at repairing the defect alleged at the hearing occurred when the vehicle had a mileage of 81,753 and thus it is "literally inconceivable that this can be considered a reasonable number of repair attempts in light of the fact that under the presumption four repair attempts are necessary within the first 24,000 miles of use." *See* Tex.Rev.Civ.Stat.Ann. art. 4413(36), § 6.07(d) (West Supp.1997) (providing circumstances in which it is rebuttably presumed that the manufacturer was allowed a reasonable number of attempts to repair a truck). However, the existence of statutory presumptions does not forbid the agency from finding that different circumstances or fewer attempts meet the requisite "reasonable number of attempts." *See id.* § 6.07(c).

The examiner found Ford was given a reasonable number of repair attempts for *a vehicle of this type*, typically used for long-distance hauls of freight; she reasoned the owners of these trucks would be unlikely to meet the presumptions as they attempt to make a living by accumulating a large number of miles over a short time. She also noted that it was "well-documented that Ford has paid its authorized dealerships for several repairs done in an attempt to correct a vibration concern even before Mr. Sheets and Mr. Bolcer were sent down to verify the concern...." For example, the second repair visit rendered the truck inoperative for three weeks while Ford attached a harmonic balancer and followed a technical service bulletin on driveline angles; it was again rendered inoperative for four weeks while Ford sent it to a Caterpillar dealership and consulted Goines. We again find the Department's assessment of the evidence, including the inference that all five complaints concerning vibration pertained to the same defect, to be reasonable. We overrule point of error two.

*Repurchase Price*

In its fifth and sixth points of error, Ford contends the Department's actions were arbitrary and capricious in determining the allowance for use of the truck and the repurchase price. Rule 107.8(4) promulgated by the Department sets a formula for determining the reasonable allowance amount credited to the manufacturer for the owner's use of the truck in the event of a repurchase. 16 Tex.Admin.Code § 107.8(4) (West 1996). Part of the formula requires dividing the number of unimpaired miles of use by the owner by the expected useful miles of the truck.[8] Rule 107.8(4) requires the Depart-

---

was afforded a reasonable number of repair attempts.

7. Specifically, the service orders of the October visit, which occurred three days after the Crosses purchased the truck, and the June visit did not indicate attempts to repair the vibration.

8. In order to determine the owner's useful allowance, the Department adds:

(A) the product obtained by multiplying the purchase price by a fraction with a denomina-

tor of 100,000 (or the number of expected useful miles shown by clear and convincing evidence) and a numerator of the number of unimpaired miles obtained by the owner; and (B) fifty percent (50%) of the product obtained by multiplying the purchase price by a fraction with a denominator of 100,000 (or the number of expected useful miles shown by clear and convincing evidence) and a numerator of the number of impaired miles obtained by the owner.

*See* 16 Tex.Admin.Code § 107.8(4) (West 1996).

ment to use 100,000 miles as the truck's expected useful life unless clear and convincing evidence shows a longer or shorter useful life. *Id.*

█ The hearing examiner found clear and convincing evidence established the useful life of the Crosses' truck was 750,000 miles. Ford contends this figure is excessive, pointing to the "egregious" result that the Crosses effectively paid only $7,958.78 for a year and a half's use of a truck that cost $83,000, "less than 10% of the purchase price despite the fact that the most depreciation of a vehicle occurs in the first year." The testimony as to the expected useful life of the Crosses' truck ranged from 500,000 to 1,500,-000 miles. Ford's consumer magazine quoted owners of a similar truck accumulating 900,000 miles. Warranties on the truck ranged from 300,000 miles to 750,000 miles under an extended plan. Although some testimony indicated a truck would need a major overhaul after 500,000 miles, the examiner noted "the need for major maintenance at ·500,000 miles does not mean that a vehicle has no useful life beyond 500,000 miles." We are unable to conclude that the examiner's estimate, which appears reasonable in light of all the evidence, was arbitrary and capricious. Point of error five is overruled.

Ford contends that, even if the useful life factor was correct, the hearing examiner applied the wrong amount for unimpaired miles in the formula because the first two repair visits did not count toward the complaint.[9] Because we have held that the hearing examiner reasonably found all five complaints pertained to the same vibration defect, she properly used the mileage from the first repair visit in determining the unimpaired miles. We overrule point of error six.

### CROSS–APPEAL

In a cross-point the Crosses assert the district court erred in dismissing their counterclaims against Ford. In its petition for judicial review, Ford named the Department and the Crosses as defendants; the Crosses in their answer brought counterclaims under the DTPA and for breach of contract and of

warranty. After the trial court affirmed the Department's order in June 1995, Ford filed a motion to strike the counterclaims on the ground the court lacked jurisdiction. The trial court granted the motion on November 11. In February 1996 the trial court granted the Crosses' motion for judgment consolidating the orders into a final judgment for purposes of this appeal.

Ford contends the district court was permitted to exercise only its statutory jurisdiction in this administrative appeal under section 7.01 of the Motor Vehicle Commission Code. Tex.Rev.Civ.Stat.Ann. art. 4413(36), § 7.01 (West Supp.1997). Ford cites no authority to support such a restriction on the trial court's jurisdiction while hearing a petition for judicial review, and we have found none. This Court has implicitly recognized the trial court's jurisdiction to hear a teacher's suit for breach of contract brought as a cross-appeal to the school district's suit for judicial review of an order of the Commissioner of Education reinstating the teacher. *See Wilmer–Hutchins Indep. Sch. Dist. v. Brown,* 912 S.W.2d 848, 853 (Tex.App.—Austin 1995, writ denied). In *Bishop Petroleum, Incorporated v. Railroad Commission,* the supreme court remanded the cause to the trial court to consider a counterclaim for an accounting filed in an appeal from a forced pooling order of the Railroad Commission. ·751 S.W.2d 485 (Tex.1988).

█ There may be impediments to a combined hearing of an administrative appeal and certain counterclaims, but they are not jurisdictional. Section 7.01 specifies that review of the Department's order shall be under the substantial evidence rule pursuant to the APA. Tex.Rev.Civ.Stat.Ann. art. 4413(36) § 7.01(a) (West Supp.1997). The APA limits the court's review to six questions of law. *See* Tex.Gov't Code § 2001.174(A)–(F) (West 1997). On the other hand, the Crosses were entitled to have a jury decide their DTPA and other claims under a preponderance of the evidence standard. The different standards and different issues involved suggest the propriety of severing the

9. Ford asserts the examiner should have used 81,753, the mileage showing at the third repair visit instead of 4,093, the mileage at the first repair visit.

counterclaims into a separate cause of action. *See* Tex.R.Civ.P. 174(b) (authorizing court to order separate trials of counterclaims); *see also* Tex.R.Civ.P. 41 (allowing court to sever "actions which have been improperly joined"). In the severed cause of action, Ford could have raised its objection to venue by complying with Texas Rule of Civil Procedure 86.

Although a trial court may not apply the preponderance of the evidence standard and the substantial evidence test in a hybrid proceeding, *see Southwestern Bell Telephone v. Public Utility Commission,* 571 S.W.2d 503, 511 (Tex.1978), in this case the trial judge concluded the substantial evidence review of the Department's order before addressing the counterclaims. At that point or earlier, the trial court could have severed the counterclaims. By contrast, a trial court may properly sustain special exceptions to pleadings brought before the court has conducted its review of the agency order under the substantial evidence standard. *See Adams v. Board of Chiropractic Examiners,* 744 S.W.2d 648, 654–55 (Tex.App.—Austin 1988, no writ). Because nothing deprived the trial court of *jurisdiction* over the counterclaims, it erred in granting the motion to strike. We sustain the cross-point.

## CONCLUSION

We find the decision of the Department of Transportation was supported by substantial evidence and was not arbitrary and capricious. We conclude, however, that the trial court erred in striking the Crosses' counterclaims. Accordingly, we affirm that portion of district court's judgment affirming the Department's order, but reverse that portion of the judgment granting Ford's motion to strike the Crosses' pleadings and sever and remand that portion of the cause for further proceedings.